# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **JAMES C. McWHORTER,** | ) | |
| | ) | |
| **Movant,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:16-cv-01942** |
| | ) | **Judge Trauger** |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

Pending before the court is *pro se* movant James C. McWhorter's motion under 28 U.S.C. § 2255 (Doc. No. 1) to vacate, set aside, or correct a sentence previously imposed by this court. *See United States v. McWhorter*, No. 3:07-cr-00159 (M.D. Tenn. July 30, 2010) (Doc. No. 494) [hereinafter cited as "Crim. Doc. No. ___"]. The respondent filed a response (Doc. No. 15), and the movant filed a reply (Doc. No. 27). For the following reasons, the court concludes that, given the overwhelming evidence presented at trial, the movant fails to demonstrate that he suffered the prejudice necessary to prevail on his *Brady* claim. Accordingly, the movant's motion (Doc. No. 1) will be denied and this action will be dismissed.

## I.    Procedural Background

On May 13, 2009, a second superseding indictment charged the movant with the following five counts: (1) conspiracy to produce false identification documents and counterfeit checks, in violation of 18 U.S.C. § 371; (2) production of one or more false identification documents, in violation of 18 U.S.C. § 1028(a)(1); (3) possession, with intent to use and transfer, five or more false identification documents, in violation of 18 U.S.C. § 1028(a)(3); (4) possession of one or more document-making implements, with the intent to utilize them in the

production of false identification documents, in violation of 18 U.S.C. § 1028(a)(5); and (5) aggravated identity theft, in violation of 18 U.S.C. § 1028A. (Crim. Doc. No. 304.)

The movant filed a motion to suppress, challenging the validity of his arrest warrant, and seeking suppression of multiple interviews he gave while in custody as well as evidence seized from his home. (Crim. Doc. No. 205 at 3–5.) Former Judge Robert L. Echols held a suppression hearing (Crim. Doc. Nos. 262–63), and then denied the movant's motion to suppress. (Crim. Doc. No. 268–69.) The movant filed a motion to reconsider denial of the suppression motion (Crim. Doc. No. 311), the court held an evidentiary hearing (Crim. Doc. No. 375), and the court denied the motion. (Crim. Doc. Nos. 337, 377–78.)

Judge Echols held a jury trial. (Crim. Doc. Nos. 379–81, 383, 385.) On November 20, 2009, a jury convicted the movant of all five counts. (Crim. Doc. No. 387.) On November 25, 2009, the movant filed a Motion for Judgment of Acquittal or in the Alternative for New Trial (Crim. Doc. No. 390), with respect to counts 2, 4, and 5. The court denied this motion. (Crim. Doc. No. 441.) On June 28, 2010, Judge Echols sentenced the movant to a total term of 124 months' imprisonment, to be followed by 3 years of supervised release. (Crim. Doc. No. 491.) The court entered judgment on July 30, 2010. (Crim. Doc. No. 494.)

On August 4, 2010, the movant filed a Notice of Appeal. (Crim. Doc. No. 496.) While his direct appeal was pending in the appellate court, on April 28, 2011, the movant filed a Motion for New Trial in this court based on newly discovered evidence under Rule 33(b)(2) of the Federal Rules of Criminal Procedure. (Crim. Doc. No. 581.) The movant argued that, after trial and sentencing, he discovered the existence of an alleged exculpatory videotape that the government had not acknowledged or disclosed. (Crim. Doc. No. 582 at 4, 6–8.) On September

29, 2011, former Judge William J. Haynes, Jr., to whom the case had been reassigned after the retirement of Judge Echols, denied the motion for a new trial. (Crim. Doc. No. 605.)

On October 10, 2011, the movant filed another Notice of Appeal. (Crim. Doc. No. 606.) On February 20, 2013, the Sixth Circuit Court of Appeals affirmed the movant's conviction and sentence. (Crim. Doc. No. 682); *United States v. McWhorter*, 515 F. App'x 511, 524 (6th Cir. 2013). On June 17, 2013, the United States Supreme Court denied the movant's petition for a writ of certiorari. (Crim. Doc. No. 686.)

On July 21, 2016, the court received the movant's *pro se* motion under 28 U.S.C. § 2255. (Doc. No. 1.) A § 2255 motion is deemed filed, however, on the date that it is submitted to prison officials for mailing to the court. *Towns v. United States*, 190 F.3d 468, 469 (6th Cir. 1999) (citing *Houston v. Lack*, 487 U.S. 266 (1988)). Here, the court considers the motion's date of filing to be the same day that the movant signed it, or July 14, 2016. (Doc. No. 1 at 12); *see Brand v. Motley*, 526 F.3d 921, 925 (6th Cir. 2008) (citations omitted) (noting that, absent contrary evidence, courts assume that a prisoner hands a complaint to prison officials for mailing to the court on the date he or she signed it).

## II. Analysis

Movant asserts a single claim under *Brady v. Maryland*, 373 U.S. 83 (1963), arguing that the government failed to disclose the alleged exculpatory video referred to in his April 2011 Motion for New Trial. (Doc. No. 1 at 4–8; Doc. No. 2 at 5–8.) In its response, the government argues that the movant's claim should be denied for three reasons: (1) it is untimely; (2) it was previously litigated on direct appeal; and (3) the video, if it exists, does not satisfy the elements of a *Brady* claim—that is, it is not favorable to the movant, it was not suppressed by the prosecution, and there was not any prejudice. (Doc. No. 15 at 7–10.) In his reply, the movant

contends that: (1) his claim is timely under 28 U.S.C. § 2255(f)(4); (2) this issue was not fully and fairly presented on direct appeal and that, even if it were, this claim presents a highly exceptional circumstance that warrants relitigation; and (3) he has satisfied the three requirements of a *Brady* claim. (Doc. No. 27 at 2–8.)

A.      Timeliness of the Motion

There is a one-year statute of limitations for the filing of § 2255 motions. 28 U.S.C. § 2255(f)(1). This one-year period begins to run "from the latest of--"

> (1) the date on which the judgment of conviction becomes final;
>
> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>
> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

*Id.* § 2255(f)(1)–(4). As an initial matter, the movant's motion is not timely under subsection (f)(1) because his judgment became final on June 17, 2013—the day that the Supreme Court denied his petition for a writ of certiorari. *See Clay v. United States*, 537 U.S. 522, 527 (2003) ("Finality attaches when [the Supreme Court] affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires."). The movant had one year from that date to file his § 2255 motion under subsection (f)(1), but he did not do so until July 14, 2016—over three years later. Nor does the movant argue that subsections (f)(2) or (f)(3) apply in this case.

The movant, however, contends that his motion is timely under subsection (f)(4) because he exercised due diligence and discovered the facts supporting his claim well after his judgment became final. Specifically, the movant argues that the one-year period for his *Brady* claim began to run when the Sparta Police Department ("SPD") responded to his request under the Tennessee Open Records Act on March 22, 2016. (Doc. No. 1 at 2–3; Doc. No. 2 at 1–2, 7; Doc. No. 27 at 2.) The movant's *Brady* claim would be timely if the limitations period started to run on this date.

For the movant's claim to fall under subsection (f)(4), he must demonstrate that he was suitably diligent in obtaining the SPD response and that the SPD response is a new factual predicate for his *Brady* claim. The Sixth Circuit has explained that subsection (f)(4) "does not require the maximum feasible diligence, only due, or reasonable, diligence." *Jefferson v. United States*, 730 F.3d 537, 544 (6th Cir. 2013) (quoting *DiCenzi v. Rose*, 452 F.3d 465, 470 (6th Cir. 2006)). "[T]he key question is whether, taking into account 'the reality of the prison system,' [the movant] could have discovered the factual predicate for his claim[] using due diligence more than a year before filing" his § 2255 motion. *Id.* (quoting *DiCenzi*, 452 F.3d at 470). The movant bears the burden of establishing that he exercised due diligence. *Id.* (citing *Johnson v. United States*, 457 F. App'x 462, 468 (6th Cir. 2012)).

Here, given the nature of the movant's claim, the court concludes that he was reasonably diligent in obtaining SPD's response to his Tennessee Open Records Act request, even though he did not make the request to the SPD until November 2015 (Doc. No. 2 at 1). In the context of a *Brady* claim, the Sixth Circuit has specifically held that subsection (f)(4)'s "requirement that a [movant] exercise reasonable diligence to discover the factual predicate underlying his claims does not require a [movant] repeatedly to seek out information that the government

unconstitutionally failed to disclose despite having notice that [the movant] sought the very information suppressed." *Id.* at 545.

After trial and sentencing in the movant's criminal case, he filed a Motion for New Trial based on newly discovered evidence of the same alleged videotape that is the basis of his *Brady* claim in this action. (Crim. Doc. No. 581.) Attached to the memorandum accompanying the motion were three letters between the movant's counsel and the prosecution, exchanged in the year after trial. First, movant's counsel sent a letter to the prosecution stating as follows:

> I sent you a letter back in December of last year inquiring about the existence of an alleged videotape from Frankie Floyd's. That letter was following my verbal conversation at trial regarding the tape to which you and the case agent indicated no recollection of such a tape. The basis of my request was Investigator Selby's statement in a document that there was a videotape of the transaction at Frankie Floyd's allegedly involving my client. I was never provided the tape referenced therein and no video has ever been disclosed.
>
> I don't have any record of you responding to my letter of December 29, 2009, and would request that you confirm in writing that no videotape exists if that is in fact the truth.

(Crim. Doc. No. 582-2.) In response, the prosecution sent a letter to movant's counsel stating as follows:

> I'm following up on your past letters and our conversation earlier this week regarding the purported surveillance videotape from Frankie Floyd's Hometown Market. As I indicated on the phone, I did have the Secret Service agent check on this matter. He confirmed from representatives at the market that they do not have video surveillance, have never had such surveillance, and never provided a videotape to any law-enforcement officer. Similarly, neither I nor the Secret Service agents have ever had any such videotape in our possession. I simply have no evidence or information of any kind that this videotape exists.

(Crim Doc. No. 582-3.) Finally, movant's counsel responded as follows in a letter:

> Despite the representations in your letter I continue to have some concerns about this issue. Enclosed is a copy of an offense report prepared by Detective Selby regarding the passing of payroll checks at Frankie Floyd's Hometown Foods on October 1 and 2, 2006. It reads in pertinent part "the incident was videoed (sic) taped." I have also enclosed a copy of [] two images that were provided in the

discovery materials from the Sparta Police Department which appear to be from Frankie Floyds.

*   *   *

I do not doubt that you "have no evidence or information of any kind that this videotape exists." However, I am troubled by the fact that it is referenced in Mr. Selby's report and more troubled by the fact that someone was apparently untruthful with the Secret Service agent regarding the surveillance at Frankie Floyd's. Based on all of the foregoing I am going to make one last request that you confirm with Det. Selby and the Sparta Police Department as well as Special Agent Randy Crain with the Tennessee Highway Patrol that the videotape referenced in Det. Selby's report of October 2, 2006 either exists or does not exist[].

(Crim. Doc. No. 582-5.)

Based on this exchange of letters, as well as the movant's Motion for New Trial subsequently filed on April 28, 2011, the government had notice that the movant sought the purported videotape that forms the basis of his *Brady* claim and denied having any information about its existence. The Sixth Circuit has held that subsection (f)(4)'s "due-diligence standard [does] not require [a movant] continuously to seek out evidence that the government had a constitutional duty to disclose (evidence that, despite specific requests by the defense for the information, the government represented did not exist)." *Jefferson*, 730 F.3d at 546. Thus, it was not improper for the movant to rely on the government's representations regarding the Floyd's video, and the movant was reasonably diligent in discovering the basis of this claim.

But application of subsection (f)(4) requires more than due diligence—it only applies if the movant can demonstrate that the SPD response is a new "factual predicate" supporting his § 2255 *Brady* claim. "[N]ew information discovered 'that merely supports or strengthens a claim that could have been properly stated without the discovery . . . is not a 'factual predicate' for purposes of triggering" subsection (f)(4). *Jefferson*, 730 F.3d at 547 (quoting *Rivas v. Fischer*, 687 F.3d 514, 535 (2d Cir. 2012)) (applying the Second Circuit's discussion of an analogous

provision of the statute of limitations in habeas corpus actions to 28 U.S.C. § 2255(f)(4)). The Sixth Circuit has acknowledged, however, that it can be difficult to determine "when suspicion and hints ripen into a factual predicate":

> Without a clear standard [as to when suspicion and hints ripen into a factual predicate], it is likely that when a prisoner spends a tremendous amount of time establishing the validity of the facts, a court may find that the initial piece of uncorroborated information would be deemed a "factual predicate" to start the statute-of-limitations period; if, however, a prisoner instead chooses to submit an application with the same piece of "raw" information, it may fail the fact-pleading requirement.

*Id.* at 548 (alteration in original) (quoting Limin Zheng, *Actual Innocence as a Gateway through the Statute-of-Limitations Bar on the Filing of Federal Habeas Corpus Petitions*, 90 Cal. L. Rev. 2101, 2135 (2002)). At this juncture, the court need not determine whether the SPD response qualifies as a new "factual predicate" because, as stated below, the court concludes that the movant's *Brady* claim fails on the merits.

### B.     Prior Determination by the Sixth Circuit

The government next argues that the movant's *Brady* claim should be dismissed because the Sixth Circuit previously decided the issue on direct appeal. (Doc. No. 15 at 8–9.) "[A] § 2255 motion may not be employed to relitigate an issue that was raised and considered on direct appeal absent highly exceptional circumstances, such as an intervening change in the law." *Jones v. United States*, 178 F.3d 790, 796 (6th Cir. 1999) (citing *Oliver v. United States*, 90 F.3d 177, 180 (6th Cir. 1996)). The movant does not identify a change in the law since the Sixth Circuit decided his direct appeal but, instead, contends that this *Brady* claim was not fully presented because he was denied due process. (Doc. No. 27 at 4–5.) Alternatively, the movant maintains that the government's failure to disclose information about the purported videotape is an "exceptional circumstance." (*Id.* at 5.)

On direct appeal, the movant argued that the district court improperly denied his Motion for New Trial—a motion based on newly discovered evidence of the same purported video at issue in this *Brady* claim. *McWhorter*, 515 F. App'x at 520. Indeed, the movant's argument in this *Brady* claim is essentially the same as his argument before the Sixth Circuit—that "he was not the person who passed the check at Floyd's and that a video would be material and exculpatory." *Id.* at 521. The primary difference, here, is that the movant relies on new evidence to establish that the purported video actually exists.

The Sixth Circuit summarized the movant's argument regarding the purported videotape on direct appeal as follows:

> McWhorter's argument centers around a police report filed by Selby after his initial visit to Floyd's following its report of the passing of a fraudulent check. In his report, Selby stated that "the incident was also videoed [sic] taped." McWhorter initially raised this issue during trial and was told that the government did not possess and was not aware of any such video. After the trial concluded, McWhorter's counsel visited Floyd's, where he noticed that Floyd's had the equipment and ability to conduct video surveillance. Additionally, McWhorter claims that still photos from the incident at Floyd's indicate that a video of the incident exists. McWhorter argues that he was not the person who passed the check at Floyd's and that a video would be material and exculpatory.

*Id.* Then, the Sixth Circuit rejected the movant's argument and affirmed the court's denial of the movant's Motion for New Trial as follows:

> First, he cannot establish that a video of the incident exists. Second, all other evidence mentioned by McWhorter was either available at trial or could have been discovered before or during trial with due diligence. His argument concerning the possible existence of the video tape is based on Selby's police report and the still photos from the incident at Floyd's, both of which were produced prior to trial. McWhorter's assertion—that Floyd's had the capability to conduct video surveillance in 2010, more than four years after the incident—is immaterial and irrelevant to the question of whether there is a video of the incident that occurred in 2006.

*Id.*

Thus, while the movant certainly raised the issue in this *Brady* claim to the Sixth Circuit on direct appeal, the appellate court did not squarely consider it—that is, the Court did not address whether, if the video actually existed, the government's failure to produce it in discovery constituted a *Brady* violation. The appellate court rightly noted only that the movant could not establish that the purported video exists. Given the alleged new evidence of the video's existence, however, the court cannot conclude that the movant's *Brady* claim is unreviewable at this stage.

### C.  Merits of the Movant's *Brady* Claim

The only evidence that the court may consider at this juncture is the evidence purportedly contained in the Sparta Police Department's response to the movant's Tennessee Open Records Act request. The movant does not provide the alleged SPD response itself but discusses it in a declaration filed at the same time as his § 2255 motion. According to the declaration, in November 2015, the movant requested that the SPD provide him "all police reports, supplements, records, and files pertaining to any investigation involving James Christopher McWhorter." (Doc. No. 2 at 1–2, 13.) On March 22, 2016, the SPD responded, presumably in writing, that there were three compact discs "in the file"—one labeled "Kroger," one labeled "McWhorter interview," and one labeled "Floyd's." (*Id.* at 3.)

In his declaration, the movant states that he contacted by telephone the SPD employee who prepared the SPD response within two days of receiving it. (*Id.* at 3.) The movant states that he recorded this phone call (*id.* at 6), but he did not submit any recording with his § 2255 motion. The SPD employee informed the movant that the disc labeled "Floyd's" contains three video files, and described the contents of these video files to the movant over the phone. (*Id.* at 3–4.) The first video file shows a woman in sunglasses "walk to the counter, hand someone . . . some

type of piece of paper, . . . [go] towards the register area," and then leave. (*Id.* at 4.) The second file shows similar footage of the same woman without sunglasses, wearing different clothes. (*Id.*) And the third file picks up where the second file ends, showing the woman walking away and a man entering the screen. (*Id.* at 4–5.) The man "follow[s] the same steps as the . . . woman" by going to a register and then leaving the store. (*Id.* at 5.) The movant maintains that the woman in these video files is "undisputably" his ex-wife, and that, based on the description provided by the SPD employee, the man in the third video matches the description of one of his co-defendants. (*Id.*)

According to the declaration, the SPD's response also reflected that there is not any record of "how [a photo lineup] was conducted or who it was conducted with" and that there was not any "photo-array or line-up in their file." (*Id.* at 2.) The movant relies on this purported absence of documentation to argue that Detective Selby was "less than truthful" at the hearing on the movant's motion to suppress before trial in testifying that "a juvenile selected [the movant] from a photo-array of six photos, and that the process was detailed in his reports." (Doc. No. 1 at 7.) The court disagrees with the movant's characterization of Detective Selby's suppression hearing testimony and does not find the testimony inconsistent with the SPD response.

Detective Selby testified at the suppression hearing that, in November 2006, he went to Floyd's Hometown Food Center in Sparta, Tennessee ("Floyd's") to investigate a report that the store "had checks that had been returned by the bank." (Crim. Doc. No. 339 at 4–5.) Selby talked to Debbie Floyd, the person who reported the checks, and Debbie Floyd took Selby to an employee who accepted a check that was later returned. (*Id.* at 5.) This Floyd's employee was under the age of 18 at the time, and gave Selby a description of "the person who had come in and passed the check," including the person's clothing, height, and weight. (*Id.* at 6.) Selby left the

store, and at some point prepared an array of photos to show the employee (*id.* at 44)—specifically, Selby prepared "a manila file folder, eight by eleven. On one side it ha[d] six holes cut out in it, where you can put pictures. And under each of those cutouts it ha[d] a number, one through six." (*Id.* at 6.) One of the photos was of the movant. (*Id.*) Selby returned to Floyd's days later, and the employee identified the movant as an individual who presented a check that was returned by the bank. (*Id.* at 6–7, 44, 46–47.)

Detective Selby's suppression hearing testimony is not inconsistent with the SPD's response to the movant's Open Records Act request because, contrary to the movant's assertion, Detective Selby did not testify that he "detailed in his reports" the process of obtaining the photo identification of the movant.[1] The fact that the purported SPD response—prepared nearly ten years after Detective Selby obtained the photo identification—does not include a record of a photo array is not new evidence that undermines the photo identification in the arrest warrant.[2] Accordingly, the only evidence to consider in the SPD response is the video purporting to show people other than the movant cashing checks at Floyd's.

To prevail on his *Brady* claim, the movant must demonstrate that the Floyd's video, as described in his declaration, satisfies the following three elements: "(1) [it is] favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) [it] must have been suppressed . . . , either willfully or inadvertently; and (3) prejudice must have ensued." *United States v. Rafidi*, 829 F.3d 437, 447 (6th Cir. 2016) (quoting *Strickler v. Greene*, 527 U.S. 263,

---

[1] Detective Selby's only suppression hearing testimony regarding information in a "file" of any kind during the investigation related to the name of the juvenile employee who identified the movant. (Crim. Doc. No. 339 at 8–9.)

[2] The validity of the photo identification is further supported by the suppression hearing testimony of Matt Stephenson, a special agent with the Nashville field office of the United States Secret Service. Stephenson testified that, on June 27, 2008, he interviewed the Floyd's employee who made the photo identification, she recalled meeting with Detective Selby in late 2006, and she "indicated that she identified McWhorter from the photos shown by Investigator Selby." (Crim. Doc. No. 519 at 6–7, 11–13.) Judge Echols found Agent Stephenson's testimony relevant in ruling on the motion to suppress. (Crim. Doc. No. 268 at 1, 3 n.2.)

281–82 (1999)) (internal quotation marks omitted). To be sure, even if the prosecution was genuinely unaware of the existence of the Floyd's video when the movant inquired about it, it was "suppressed" within the meaning of *Brady* because "inadvertent failure to disclose is enough for a *Brady* violation." *See Mike v. Ryan*, 711 F.3d 998, 1017 (6th Cir. 2013) (citing *Strickler*, 527 U.S. at 282) ("Even if there somehow weren't actual knowledge of [*Brady* material], inadvertent failure to disclose is enough for a *Brady* violation."). The movant's *Brady* claim fails, however, because he has not demonstrated that prejudice ensued.

"Prejudice (or materiality) in the *Brady* context is a difficult test to meet . . . ." *Montgomery v. Bobby*, 654 F.3d 668, 678 (6th Cir. 2011) (quoting *Jamison v. Collins*, 291 F.3d 380, 388 (6th Cir. 2002)). The movant must show there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Ross*, 245 F.3d 577, 584 (6th Cir. 2001) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433–34 (1995)). "A reasonable probability is a 'probability sufficient to undermine confidence in the outcome.'" *Wilson v. Parker*, 515 F.3d 682, 701–02 (6th Cir. 2008) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). The ultimate question is not "whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Montgomery*, 654 F.3d at 679 (quoting *Kyles*, 514 U.S. at 434).

Based on the overwhelming evidence presented at trial, the court concludes that the outcome of the trial would not have been different if the Floyd's video had been disclosed to the defense. The movant specifically argues that the video would have altered the outcome of the trial because it would have negated probable cause in the arrest affidavit, invalidated the arrest warrant, and required the suppression of all resulting evidence. (Doc. No. 1 at 8; Doc. No. 27 at

8.) The court concludes, however, that the alleged video would not have required suppression of evidence resulting from the movant's arrest.

As the Sixth Circuit noted on direct appeal, "[a] clerk at Floyd's identified McWhorter as having passed the fraudulent check." *McWhorter*, 515 F. App'x at 516. A video showing people other than the movant cashing checks at Floyd's does not negate this identification. Indeed, the movant's declaration does not include any indication that the activity depicted in the Floyd's video even occurred on the date referenced in the arrest warrant. Thus, the court simply has no basis to disregard the Sixth Circuit's finding that the employee's identification "constitute[d] probable cause for [the defendant's] arrest and 'a warrant is not required to effect a public arrest so long as the officers possess probable cause.'" *McWhorter*, 515 F. App'x at 516 (quoting *United States v. Calandrella*, 605 F.2d 236, 246 (6th Cir. 1979)).

Further, the Sixth Circuit found that "the Metro officers who arrested [the defendant] relied in good faith on the warrant procured by Selby[,]" and so "the good faith exception to the exclusionary rule established in *United States v. Leon*, 468 U.S. 897 (1984) applie[d]." *Id.* (citing *Arizona v. Evans*, 514 U.S. 1, 14–16 (1995)). Even "[w]hen police rely on an invalid warrant, the good-faith exception bars suppression of the evidence unless 'a reasonably well trained officer would have known' that the warrant was defective." *United States v. Newsome*, 504 F. App'x 463, 465 (6th Cir. 2012) (quoting *Leon*, 468 U.S. at 922 n.23). The Sixth Circuit, therefore, essentially found that the Metro officers who arrested the movant could not have reasonably questioned the arrest warrant's validity. The only evidence the court may consider at this juncture—the alleged Floyd's video—does not undermine the Sixth Circuit's conclusion. Thus, the Floyd's video would not have required suppression of the evidence gathered after the movant's arrest.

At this stage, therefore, one question remains: if, at trial, the movant possessed a video of other people seemingly cashing checks at Floyd's in the manner described in his declaration, is there a reasonable probability that the result of his trial would have been different? Given the evidence at trial as to the offenses of conviction, it is clear that the answer is "no."

As stated above, the jury found the movant guilty of five separate offenses relating to the production or possession of false identification documents, namely: (1) conspiracy to produce fraudulent driver's licenses; (2) production of one or more fraudulent driver's licenses; (3) possession of five or more fraudulent driver's licenses with intent to use and transfer them; (4) possession of one or more document-making implements, with intent to use them to make fraudulent identification documents; and (5) using another person's name and social security number or driver's license number to produce a fraudulent driver's license. (Crim. Doc. No. 387.)

The Sixth Circuit summarized the evidence on direct appeal supporting the movant's convictions. On November 8, 2006, Metro officers arrested the movant based on the active arrest warrant Detective Selby obtained in White County. *McWhorter*, 515 F. App'x at 514. Detective Selby and Special Agent Randy Crain of the Tennessee Highway Patrol spoke to the movant that day at the Criminal Justice Center in Nashville, Tennessee. *Id.* Eventually,[3] the movant "made inculpatory statements [to Selby and Crain] and consented to a search of his home and computers." *Id.* at 515.

Selby and Crain's interview with the movant was recorded, and clips were shown to the jury at trial. (Crim. Doc. No. 521 at 76–97.) The movant stated that he had produced fraudulent

---

[3] Before discussing the substance of his involvement, the movant sought to obtain an agreement that the district attorney would provide favorable treatment for his then-wife, who was also in custody at the time, in exchange for his cooperation. *United States v. McWhorter*, 515 F. App'x 511, 514–15 (6th Cir. 2013). During this time, the movant was taken to speak with his wife in person at the nearby Davidson County Sheriff's Department for approximately 15 minutes. *Id.* at 515.

Tennessee driver's licenses and described the process and materials he used to do so. (*Id.* at 79–80.) He stated that, at the beginning of the operation, he used a computer to print fraudulent licenses on peel-and-stick laminates that he supplied to one of the co-defendants in his federal criminal case. (*Id.* at 85–86.) The movant explained that, later, he obtained a DMV printer and used it to produce higher quality fraudulent licenses. (*Id.* at 82, 84–85.) He explained that he included security codes on the fraudulent licenses but that he could not exactly reproduce the licenses' hologram seal. (*Id.* at 82–85, 90–91.) According to the movant, some people involved in the operation cashed checks, some provided money, and some filled other roles. (*Id.* at 87–89.) The movant discussed different stores' procedures for cashing checks. (*Id.* at 91.) He also discussed computer graphics programs he used to produce fraudulent licenses and explained security measures protecting the information stored on the computer he used to produce licenses. (*Id.* at 92–93.)

As to physical evidence, the Sixth Circuit explained that officers searched the movant's home after his interview with Selby and Crain and "seized hundreds of fake IDs, fake checks, computers, printers, and other evidence." *McWhorter*, 515 F. App'x at 515. This included a computer, DMV printer, two other printers, electronic signature pad, scanner, more than 300 fraudulent driver's licenses, blank cards for producing more fraudulent licenses, peel-and-stick labels, laminating and cutting device, fraudulent checks, and other items. (Crim. Doc. No. 521 at 81–82, 93–94; Crim. Doc. No. 522 at 12–14, 16–29, 52–53.)

The Sixth Circuit noted that Crain and Special Agent Nathan Landkammer of the United States Secret Service interviewed the movant in May 2007 at the Riverbend Maximum Security Complex in Nashville, Tennessee. *McWhorter*, 515 F. App'x at 515. Landkammer "was investigating federal offenses involving counterfeit identification documents, identity theft, and

conspiracy." *Id.* After Landkammer made clear that he only wanted to discuss federal offenses, rather than state offenses, the movant "made inculpatory statements to Landkammer regarding the federal offenses." *Id.* Specifically, Landkammer testified at trial that the movant admitted producing fraudulent driver's licenses from January 2016 through November 2016 and explained different people's roles in the operation. (Crim. Doc. No. 523 at 112–13, 140–41.) According to Landkammer, the movant also stated that a co-defendant purchased a DMV printer that was used to make higher quality fraudulent Tennessee driver's licenses. (*Id.* at 113.)

Finally, the Sixth Circuit summarized some additional evidence supporting the movant's conviction on count 5, aggravated identity theft. *McWhorter*, 515 F. App'x at 520. In ruling on the movant's challenge to the sufficiency of the evidence supporting his conviction on count 5, the Sixth Circuit noted that the movant's "argument depend[ed] on discrediting [co-defendant Chad] Vincent's testimony as unreliable." *McWhorter*, 515 F. App'x at 520. Specifically, Vincent testified that the movant

> provided the name, social security number, and other necessary information of a real person in their effort to make an identification card that contained verifiable information of a real person. [The movant] created the identification card using the same computer and printer he had used to make other identification cards. Vincent unsuccessfully attempted to cash a fake check using the identification card created by [the movant].

*Id.* The Sixth Circuit pointed out that "evaluations of a witness's credibility are made by the jury and not by the court." *Id.* (citing *United States v. Graham*, 622 F.3d 445, 448–49 (6th Cir. 2010)). Thus, "[i]n light of Vincent's testimony and the testimony in general throughout the trial regarding the conspiracy," the Sixth Circuit affirmed the district court's denial of the movant's motion to acquit on count 5. *Id.*

In sum, for the reasons stated above, there is not a reasonable probability that the court would have invalidated the movant's arrest warrant if he possessed video of other people

seemingly cashing checks at Floyd's in the manner described in his declaration. The evidence gathered as a result of the movant's arrest, therefore, would have been available at trial. That is, the jury still would have watched clips of the movant's inculpatory statements to Selby and Crain, heard testimony on the movant's inculpatory statements to Landkammer, and seen physical evidence supporting the convictions recovered after the movant consented to a search of his home, including hundreds of fraudulent Tennessee driver's licenses, fraudulent checks, and a variety of equipment used to make them. The jury also would have heard Chad Vincent's testimony, among other evidence.

A jury convicted the movant of five offenses relating to the production or possession of fraudulent identification documents. Given the evidence at trial, the movant has not shown there is any reason to believe that the jury would have found video of other people cashing checks at Floyd's relevant to the five offenses of conviction. Accordingly, the movant was not prejudiced by the fact that the purported Floyd's video was not disclosed.

### III.    Conclusion

For these reasons, the movant is not entitled to an evidentiary hearing, and the movant's *Brady* claim fails on the merits. Accordingly, the movant's motion under 28 U.S.C. § 2255 (Doc. No. 1) will be denied and this action will be dismissed.

Rule 11(a) of the Rules Governing § 2255 Cases requires that a district court "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate of appealability may issue only if the "applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve

encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). The court finds that the movant has not satisfied this standard, and will therefore deny a certificate of appealability.

An appropriate order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge